In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––––

No. 25-3127

JACIEL CIRRUS ROJAS,

*Petitioner-Appellant*,

*v.*

SAMUEL OLSON, Field Office Director, Chicago Field Office, Immigration and Customs Enforcement, and SCOTT SMITH, Jail Administrator, Dodge County Jail,

*Respondents-Appellees*.

––––––––––––––––

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:25-cv-01437 — **Brett H. Ludwig**, *Judge*.

––––––––––––––––

ARGUED JUNE 15, 2026 — DECIDED JULY 30, 2026

––––––––––––––––

Before SYKES, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges*.

KOLAR, *Circuit Judge*. This case is about a change in the federal government's longstanding interpretation of its immigration-detention laws. After living in this country since 2018, Jaciel Cirrus Rojas was caught in the throes of that change last year. When the Department of Homeland Security ("DHS")

arrested him for unlawfully entering the country without inspection, it cited Title 8 U.S.C. § 1226. An immigration judge found him neither a danger to the community nor a risk of flight and ordered him released on bond pending his removal, also using Section 1226. It is no surprise this case started with Section 1226, the provision that the government has long used to detain "aliens" (the statutory term for any noncitizen) present in the country's interior without inspection.

But despite DHS's initial use of Section 1226 and the immigration judge's order, the agency reversed course. It refused to release Cirrus Rojas based on a neighboring provision, Section 1225(b)(2)(A), which was previously used to detain aliens without a bond determination only when they were apprehended at the nation's borders. DHS now contends that for decades everyone has read the relevant statutory provisions incorrectly and that Section 1225, not 1226, controls, requiring Cirrus Rojas's detention without so much as a hearing on bond. In response to this change in interpretation, Cirrus Rojas filed a petition for a writ of habeas corpus pursuant to Title 28 U.S.C. § 2241 to secure his release from detention.

This sets the stage for the question presented in this appeal: whether Section 1226 or Section 1225 governs Cirrus Rojas's detention. That narrow question determines whether millions of aliens living in the United States are subject to mandatory detention, or are eligible for bond hearings before an immigration judge. The issue has split the circuits, though

No. 25-3127                                                              3

a consensus is emerging.[1] We have yet to definitively rule upon the issue, leaving our district courts without binding authority to help resolve the many similar habeas petitions flooding their dockets. We add but a few more drops of ink to the gallons already spilled, seeking to avoid simple repetition while answering the question before us.

DHS rests its new interpretation on changes Congress made to the Immigration and Nationality Act ("INA") almost thirty years ago. Before those changes, aliens who unlawfully entered the country were given greater procedural rights than those who presented for inspection at the border. Congress ended that disparity by creating a legal fiction in removal proceedings that "deemed" all aliens not properly admitted "applicants for admission" to the United States, as if they had never crossed the border. But before last year, no administration had ever suggested this legal fiction extended beyond the INA's removal procedures to its provisions governing detention pending removal.

---

[1] *Compare Barbosa da Cunha v. Freden*, 175 F.4th 61 (2d Cir. 2026) (rejecting DHS's interpretation), *petition for cert. filed*, No. 26-104 (U.S. July 24, 2026), *Hernandez Alvarez v. Warden, Federal Detention Center Miami*, 175 F.4th 1258 (11th Cir. 2026) (same), *Lopez-Campos v. Raycraft*, 175 F.4th 713 (6th Cir. 2026) (same), *petition for cert. filed*, No. 25-1415 (U.S. June 22, 2026), *and Santillan Quiroz v. Mullin*, 180 F.4th 1226 (10th Cir. 2026) (same), *with Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026) (adopting DHS's interpretation), *petition for cert. filed*, No. 26-43 (U.S. July 14, 2026), *and Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026) (same); *see also Sosnava Rodriguez v. Ortega*, 180 F.4th 702 (5th Cir. 2026) (acknowledging *Buenrostro-Mendez*'s statutory holding but requiring bond hearings on constitutional grounds), *vacated and reh'g en banc granted*, __ F.4th __, 2026 WL 2014647 (5th Cir. July 10, 2026).

The crux of the parties' disagreement is how far the legal fiction of "deeming" Cirrus Rojas an "applicant for admission" stretches. As we detail below, Section 1225(b)(2)(A) imposes mandatory detention on certain "applicants for admission," but only those who are also "*seeking* admission." And Cirrus Rojas is not seeking admission: the relief he now seeks, asylum and withholding of removal, is not admission as the statute and Supreme Court case law use that term. Cirrus Rojas has never applied for anything that counts as "admission" to the United States. Nor can he successfully "seek" admission, as his unlawful entry renders him inadmissible. The government simply argues that because Cirrus Rojas is "deemed" an "applicant for admission," he must be "seeking admission."

We hold that Cirrus Rojas is not "seeking admission"— and thus not covered by Section 1225(b)(2)(A)—because that is his real-world status. We join the majority of the circuits that have confronted this question in rejecting the government's newfound statutory requirement for mandatory detention, which rests upon the illogical use of both legal fiction and ordinary meaning for the same term.

Congress may use legal fictions to place statutory terms in their desired context. But legal fictions are just that—fictions. One mixes fiction with fact at their peril. And the facts in this case are clear: Cirrus Rojas is not seeking admission to the United States. If Congress had meant to define individuals like Cirrus Rojas as "seeking admission," it could have done so. But that is not what our elected representatives decided to do, and we must apply the statute as it is written.

Our holding is limited. We deal only with whether *all* aliens present without admission in the interior and facing

removal proceedings are subject to mandatory detention. Under the INA's plain text, context, and history, the answer is no. Aliens present in the country without admission and not "seeking admission" fall under Section 1226, not Section 1225(b)(2)(A), and are eligible for bond hearings subject to the INA's other requirements. Because the government provides no reason other than its statutory analysis to deny Cirrus Rojas's petition for a writ of habeas corpus, we reverse the district court's denial and remand.

## I. Background

Jaciel Cirrus Rojas, a Mexican national, has lived in the United States since 2018 when he entered without inspection. As discussed, DHS arrested him in June 2025 on a warrant that cited 8 U.S.C. § 1226 as the legal basis for his detention. He was placed in removal proceedings and sought release on bond pending his removal. An immigration judge found him neither a flight risk nor a danger to the community and ordered him released on bond.

DHS appealed to the Board of Immigration Appeals ("BIA"). It argued—based on new agency guidance issued days before the immigration judge's decision—that Cirrus Rojas did not fall under Section 1226 after all. Rather, DHS argued that Cirrus Rojas was covered by 8 U.S.C. § 1225(b)(2)(A), subjecting him to mandatory detention without bond. DHS also unilaterally stayed the immigration judge's bond order pending appeal, so Cirrus Rojas remained in custody. *See* 8 C.F.R. § 1003.19(i)(2).

Cirrus Rojas petitioned for a writ of habeas corpus in federal district court. And, back in his removal proceedings, he requested asylum, withholding of removal, and protection

under the Convention Against Torture. While his habeas petition was pending, the BIA reversed the immigration judge's bond order. It did so based on its new precedent adopting DHS's interpretation of Section 1225(b)(2)(A). *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (B.I.A. 2025). The district court agreed with DHS, too. It concluded that Cirrus Rojas must be detained pending his removal proceedings and denied his petition. Cirrus Rojas filed this appeal.

While Cirrus Rojas's appeal was pending, a California district court vacated the BIA's decision adopting the government's new interpretation of Section 1225 in a nationwide class action. *Bautista v. Santacruz*, 820 F. Supp. 3d 1016, 1030 (C.D. Cal. 2026). Cirrus Rojas sought another bond hearing in the wake of this class action, and a different immigration judge again ordered him released. This time DHS did not immediately appeal and automatically stay the bond order, and Cirrus Rojas was released from custody. A few weeks later, the Ninth Circuit stayed the California district court's order pending appeal, and DHS promptly issued a notice purporting to cancel Cirrus Rojas's bond. DHS also appealed to the BIA.

Before oral argument, we ordered the parties to brief whether Cirrus Rojas's habeas petition is now moot. And we ordered DHS to state if it intends to re-detain Cirrus Rojas. The government stated it would re-detain him "if, while this [appeal] is pending, the [BIA] reverses his grant of release on bond." And after we held oral argument, the BIA did just that and reversed and vacated the second bond order.

## II. Discussion

We begin with whether Cirrus Rojas's release from custody has mooted his habeas petition and conclude it does not. We then turn to the statutory question and conclude that Cirrus Rojas is eligible for a hearing on bond under Section 1226.

### A. Mootness

We have jurisdiction over "Cases" and "Controversies." U.S. Const. art. III, § 2. "That constitutional requirement ensures that the parties before us retain a 'personal stake' in the litigation." *Moore v. Harper*, 600 U.S. 1, 14 (2023) (citation omitted). The mootness doctrine "addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit," stripping a federal court's subject-matter jurisdiction. *Id.* (citation omitted).

A party loses a personal stake in an appeal when we can no longer grant "any effectual relief." *Calderon v. Moore*, 518 U.S. 149, 150 (1996) (citation omitted). This standard is "demanding." *Mission Product Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019). So long as a court can provide even a "partial remedy," an appeal is not moot. *Calderon*, 518 U.S. at 150 (citation omitted).

Cirrus Rojas seeks relief through a writ of habeas corpus. Habeas petitioners typically seek a reduction in, or release from, custody. *See DHS v. Thuraissigiam*, 591 U.S. 103, 119 (2020) (habeas is "at its core a remedy for unlawful executive detention" (citation omitted)); *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991) (habeas may be used to obtain "a quantum change in the level of custody"). Ordering Cirrus Rojas released from physical custody now might not seem to provide

meaningful relief because the record suggests the government has not yet re-detained him.

Nonetheless, we conclude on these unique facts that Cirrus Rojas's appeal is not moot. Nothing stops DHS from re-detaining him now, and that is precisely what it has vowed to do. Cirrus Rojas was only released on bond because of a class-action order that is no longer in place. DHS purported to cancel the bond on which he was released. Then it promised to re-detain him, even while this appeal remains pending, once the BIA reversed the immigration judge's bond order. And now that the BIA has reversed, nothing, absent our intervention, stops the government from making good on its promise.

Cirrus Rojas's "release" is at most a temporary "reprieve from detention" that appears likely to end "at any time." *Rosales-Garcia v. Holland*, 322 F.3d 386, 395–96 (6th Cir. 2003). This burden is "an actual injury traceable to" the government that is "likely to be redressed by a favorable" habeas judgment. *Id.*; *see Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability."). We therefore hold that this appeal is not moot.[2]

### B.  Interpretation of the INA's Detention Provisions

With our jurisdiction secure, we turn to the merits. In reviewing the district court's statutory interpretation *de novo*, we consider the INA's "text, structure, and history." *See United States v. Liestman*, 97 F.4th 1054, 1060 (7th Cir. 2024) (*en*

---

[2] Article III mootness aside, Cirrus Rojas has satisfied the habeas statute's "in custody" requirement because he was in custody when he filed his petition. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

*banc*). Starting with the text and structure, we conclude that Cirrus Rojas has the better reading. Then, widening our lens, we look to the INA's amendments and historical interpretations to confirm its plain meaning. Finally, we consider in the alternative whether DHS's interpretation invites constitutional concerns.

Two INA provisions are at issue. We take them in the order that the government used them in detaining Cirrus Rojas. Recall that DHS initially detained Cirrus Rojas pursuant to a warrant issued under Section 1226 ("Apprehension and detention of aliens"). We focus on Section 1226(a):

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States. Except as provided in subsection (c) and pending such decision, the Attorney General--
>
> > (1) may continue to detain the arrested alien; and
> >
> > (2) *may release* the alien on--
> >
> > > (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
> > >
> > > (B) conditional parole[.]

(Emphasis added).

Though Section 1226(a) permits bond, bond is by no means guaranteed. An immigration officer makes the first detention decision. 8 C.F.R. § 236.1(c)(8). This officer must presume that detention is required, *see id.*, and has "extremely

broad discretion in deciding" whether to grant bond, *In re Guerra*, 24 I. & N. Dec. 37, 39 (B.I.A. 2006). If the officer denies bond, an alien may petition for a bond hearing before an immigration judge. 8 C.F.R. § 236.1(d)(1). But the judge must also presume detention is necessary. *See Matter of Siniauskas*, 27 I. & N. Dec. 207, 207 (B.I.A. 2018). And the burden to prove otherwise rests with the alien: the government need not present any evidence justifying detention. *See id.* at 207–08; *Guerra*, 24 I. & N. Dec. at 39–40. If the judge orders bond, the government may appeal to the BIA—where the same burden applies in its favor—and may unilaterally stay the judge's bond order pending appeal. *Guerra*, 24 I. & N. Dec. at 39–40 (burden on appeal rests on alien); 8 C.F.R. § 1003.19(i)(2) (unilateral stay).

The government has since decided, though, that Cirrus Rojas is not even entitled to these procedures. Instead it argues his detention is mandatory under Section 1225 ("Inspection by immigration officers; expedited removal of inadmissible arriving aliens; referral for hearing"). Here, we focus on Section 1225(b)(2)(A):

> [I]n the case of an alien who is an *applicant for admission*, if the examining immigration officer determines that an *alien seeking admission* is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under Section 1229a of this title.

(Emphasis added).

Congress added Section 1225(b)(2)(A) and Section 1226(a) in their current forms to the INA in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"),

Pub. L. No. 104-208, §§ 302, 303, 110 Stat. 3009-546, 3009-582, -585. For the nearly thirty years since IIRIRA, five presidential administrations—including the first administration of President Donald J. Trump—have applied Section 1225(b)(2)(A) to aliens "at the Nation's borders and ports of entry" and Section 1226(a) to aliens "inside the United States." *Jennings v. Rodriguez*, 583 U.S. 281, 287–88 (2018); *see Barbosa da Cunha v. Freden*, 175 F.4th 61, 91 (2d Cir. 2026), *petition for cert. filed*, No. 26-104 (U.S. July 24, 2026).

Now DHS has changed its view. So we must decide whether Section 1226 or Section 1225 governs Cirrus Rojas's detention. If Cirrus Rojas reads the statutes correctly, he and others like him are entitled to bond hearings under Section 1226(a). But if the government's reading is correct, they must be detained without bond hearings under Section 1225(b)(2)(A).

### 1. Statutory Text

The government's recent reinterpretation turns on the statutory term "applicant for admission." That term is explained in Section 1225(a)(1):

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission.

Cirrus Rojas does not meaningfully contest that he is "deemed" an "applicant for admission" under

Section 1225(a)(1)—that is, he is an "alien present in the United States who has not been admitted." Thus, the government argues, he falls under Section 1225(b)(2)(A)—which itself applies to "an alien who is an applicant for admission"—and so he must be detained without bond.

Cirrus Rojas disagrees. He argues Section 1225(b)(2)(A) applies only to those who are both "applicants for admission" and "seeking admission." The INA defines "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). It does not define what "seeking" admission means. But Cirrus Rojas observes that the ordinary meaning of "seeking" connotes "an affirmative step of search or pursuit."[3] *Hernandez Alvarez v. Warden, Federal Detention Center Miami*, 175 F.4th 1258, 1268 (11th Cir. 2026) (citation omitted); *see Oxford Encyclopedic English Dictionary* 1311 (3d ed. 1996) (defining "seek" as, *inter alia*, to "try or want to find or get" or "ask for; request"). He says he is not "seeking" (as ordinarily understood) "admission" (as the INA defines the term). Indeed, his time to do so has passed: he unlawfully entered the country eight years ago without inspection. So even though he is "deemed" an "applicant for admission" as a legal fiction under Section 1225(a)(1), he relies on the fact that he is

---

[3] By "ordinary meaning" here, we refer to "the content of what the statutory text would convey to a reasonable English user in the context of everyday communication," as opposed to "[p]lain meaning," which "refers to a judgment that whatever the statutory text conveys in context is clear from the text." Marco Basile, *Ordinary Meaning and Plain Meaning*, 110 Va. L. Rev. 135, 158 (2024). Plain meaning can arise not only from ordinary meaning, but also a statutorily imposed meaning that diverges from ordinary meaning.

not presently "seeking" "admission" to argue he is not subject to Section 1225(b)(2)(A).

The government does not distinguish an "applicant for admission" from one "seeking admission." It claims all "applicant[s] for admission" must be "seeking admission" under Section 1225(b)(2)(A). In its view, these terms are a "doublet—'two ways of saying the same thing that reinforce its meaning.'" *Hernandez Alvarez*, 175 F.4th at 1295 (Lagoa, J., dissenting) (citation omitted); *see American Heritage Dictionary of the English Language* 63 (1980) (defining "apply" as, *inter alia*, "[t]o request or seek employment, acceptance, or admission").

The government's argument does not get off the ground without a logical leap we see little reason to make. We agree that the *ordinary meaning* of "applicant for admission" could perhaps include "seeking admission." But the government goes a step too far. It argues that because Cirrus Rojas is "*deemed*" an "applicant for admission," he is also deemed to be all that flows from that term's ordinary meaning—including "seeking admission." This conclusion does not follow; it mixes an admitted legal fiction with fact. And the fact remains: Cirrus Rojas is not presently seeking a form of relief qualifying as admission.

When Congress "deems" something, we take it as a *departure* from the term's ordinary meaning in favor of a particularized one. *See Barbosa da Cunha*, 175 F.4th at 76 ("Where a statute deems a term to have a particularized meaning, an analogy to its use in everyday conversation is of limited help."); *see also Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (the word "deemed" "is used in legal materials to treat something as if it were really something else" (cleaned up)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

*Legal Texts* 225 (2012) ("Drafters often specify the meaning of the terms they use. Individual statutes often contain definition sections giving ordinary words a limited or artificial meaning.").

Section 1225(a)(1) explains "applicant for admission" as a term of art—relevant here, as "[a]n alien present in the United States who has not been admitted." This artificial "deeming" mandates that the ordinary meaning of "applicant for admission" must give way to Congress's chosen definition. *See Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 160 (2018). And Section 1225(a)(1) does *not* say applicants for admission are necessarily seeking admission. But Section 1225(b)(2)(A)'s mandatory-detention clause does use the unique phrase "seeking admission," and we cannot ignore that meaningful variation. *See Russello v. United States*, 464 U.S. 16, 23 (1983) (discussing canon of meaningful variation). The government attempts to read "seeking admission" into Section 1225(a)(1)'s definition of "applicant for admission" with little textual support.[4] Congress could have defined "seeking admission" consistent with the government's reading; it did not do so.

We apply the artificial meaning to "*applicant* for admission" because the statute requires it. But because the term

---

[4] Indeed, IIRIRA struck a provision of the INA that never took legal effect, which would have "deemed" individuals like Cirrus Rojas as "seeking entry and admission." *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 414, 110 Stat. 1214, 1270; IIRIRA § 308(d)(2)(D), 110 Stat. at 3009-617. IIRIRA thus ensured that "seeking admission" remained undefined in Section 1225(b)(2)(A). "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 593 U.S. 374, 393 (2021) (citation omitted).

"*seeking* admission" is undefined, we must apply its ordinary meaning. *Feliciano v. Department of Transportation*, 605 U.S. 38, 45 (2025); Scalia & Garner, *supra*, at 69, 226. While Section 1225(a)(1)'s "deeming" language may make Cirrus Rojas an applicant for admission "abracadabra-style," *Sturgeon*, 587 U.S. at 47, it does not conjure a fictional intent to seek admission. Congress holds the magic wand to "deem" that statutory terms carry a specific meaning in this context; the Executive does not.

The dissent thoughtfully recognizes that the labyrinthine nature of the INA complicates the use of dictionary definitions and canons of construction, and we share the view that generations of overlapping legislation coupled with defined terms make our task a difficult one. But we trudge on, marching next to our dissenting colleague[5] even as we hear the drum beat a bit differently. At least to our ears, solving the riddle before us by mixing a legal fiction with ordinary meaning is less faithful to the statutory scheme and the words Congress chose.

With that in mind, we agree with Cirrus Rojas that he is not "seeking admission" as the term is ordinarily understood. Again, admission means "lawful entry … into the United States after inspection and authorization." *Sanchez v. Mayorkas*, 593 U.S. 409, 411 (2021) (citing 8 U.S.C. § 1101(a)(13)(A)). Cirrus Rojas entered the United States without admission or parole in 2018, making him "inadmissible" under the INA. *See* 8 U.S.C. § 1182(a)(6)(A)(i). "[O]nce a noncitizen has entered

---

[5] Judge Kirsch and many colleagues from our sister circuits have likewise produced well-reasoned explanations supporting a broader reading of Section 1225. *See Castañon-Nava v. DHS*, 175 F.4th 828, 871–77 (7th Cir. 2026) (Kirsch, J., dissenting); *supra* note 1.

unlawfully, no amount of legal maneuvering allows him to go back in time and make his initial entry lawful." *Santillan Quiroz v. Mullin*, 180 F.4th 1226, 1239 (10th Cir. 2026).

Rather, those in Cirrus Rojas's shoes—though deemed "applicants for admission"—can only seek to remain in the United States through other forms of relief that are *not* admission. Cirrus Rojas's own case illustrates this point. He has petitioned for asylum, withholding of removal, and protection under the Convention Against Torture in his removal proceeding—all legal statuses different from "admission."[6] *Sanchez*, 593 U.S. at 415.

This highlights a fundamental issue with the government's reasoning. To read Section 1225(b)(2)(A)'s use of "seeking admission" as merely another way of saying "applicant for admission" ignores that while "applicants for admission" *may* literally "seek admission," they do not always do so. Indeed, they *cannot* (at least not successfully) "seek admission" after unlawfully entering. Cirrus Rojas is an "applicant for admission" because he is an alien present in the country and not admitted. But he wisely does not "seek" the "lawful entry" that he could never obtain. Compare that with an "applicant for admission" at the border. That applicant may affirmatively seek—and subject to the INA's other requirements, secure—admission. Both Cirrus Rojas and our example of an alien at the border are deemed "applicants for admission." But the applicant at the border actually seeks what Cirrus Rojas has not sought and cannot obtain: admission.

---

[6] For this same reason, the district court's alternative conclusion that Cirrus Rojas is "seeking admission" by seeking asylum misses the mark.

The dissent correctly notes that we look to real-world facts in attempting to answer a legal question of statutory analysis. But that approach follows from our textual reading of "seeking" and "applicant" as meaningfully distinct terms. We do not suggest that Cirrus Rojas could alter the plain meaning of the INA based on his factual circumstances. Nor do we suggest that, if that plain meaning *did* reach Cirrus Rojas's circumstances—if, for example, he were on a quixotic quest to seek the admission that he cannot obtain—he would escape the grasp of Section 1225(b)(2)(A)'s mandatory-detention provision. We simply apply the relevant statutory provision to the facts in the record before us based upon Cirrus Rojas's decision to seek forms of relief that do not qualify as admission.

As it has in other cases, the government likens Cirrus Rojas to a student who is an "applicant for admission" to a college, and who seeks admission to that college even after their initial application. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502 (5th Cir. 2026), *petition for cert. filed*, No. 26-43 (U.S. July 14, 2026); *Avila v. Bondi*, 170 F.4th 1128, 1134 (8th Cir. 2026). But that only spotlights the error in mixing defined or deemed terms and ordinary meaning. The student is an applicant for admission precisely because they are seeking admission; Cirrus Rojas is an "applicant for admission" only because the statute deems him so. In the college example, Cirrus Rojas is a nonstudent who has never applied to college sitting in on a lecture long after the semester's registration deadline has passed.

The government also contended at oral argument that Section 1225(a)(1)'s "deeming" clause does not exclusively *define* the category "applicant for admission" by using the word "means," but merely "deems" as a legal fiction "present" and

"arriving" aliens to fall within that undefined category. In the government's view, the term's outer boundary is instead set by the ordinary meaning of "applicant for admission." Our dissenting colleagues in the Sixth and Eleventh Circuits have reasoned similarly. *See Lopez-Campos v. Raycraft*, 175 F.4th 713, 743 (6th Cir. 2026) (Murphy, J., dissenting), *petition for cert. filed*, No. 25-1415 (U.S. June 22, 2026); *Hernandez Alvarez*, 175 F.4th at 1288 (Lagoa, J., dissenting).

But neither these dissents nor the government cite any authority stating that "deemed" as used in Section 1225(a)(1) is *not* definitional. Indeed, the Tenth Circuit recently collected other examples in the U.S. Code where "deem" functions as "quintessential definitional language." *Santillan Quiroz*, 180 F.4th at 1243 (citation omitted). That is how we see it being used here: the way Section 1225(a)(1) is set up strongly implies that it is definitional. "Applicant for admission," like "alien" or "immigrant," is a discrete label used throughout the INA—unlike, for instance, the "deeming" provision that the Supreme Court considered in *Sturgeon*, which "deemed" certain lands to fall outside real "geographic boundaries" for legal purposes. 587 U.S. at 47.

More to the point, whether Section 1225(a)(1)'s deeming clause defines "applicant for admission" exclusively or non-exclusively is irrelevant. A local code could deem bicycles, among other unspecified vehicles, to be "motorized vehicles" for purposes of a ban on such vehicles in public parks. It does not follow that bicycles are deemed to have motors for purposes of emissions-testing requirements. The question, in other words, is whether Section 1225(a)(1)'s acknowledged legal fiction "behave[s] in the way" DHS posits by imposing the real-world consequences of "applicant" on those who are

"deemed" to fall within that category. *Santillan Quiroz*, 180 F.4th at 1243–44. And for the reasons already stated, we do not believe it does.

The government next turns to Section 1225's other provisions to justify equating "applicant for admission" and "seeking admission." It points to another subsection in 1225 that says "[a]ll aliens … who are applicants for admission *or otherwise seeking admission* … shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3) (emphasis added). This provision, the government contends, suggests that "applicant for admission" is a subset of those "seeking admission."

We are unpersuaded. True, "or otherwise" can be read "as a catchall: the specific items that precede it are … subsumed by what comes after [it]." *Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019) (citation omitted). But "or otherwise" can also "refer to something that is different from something already mentioned." *Lopez-Campos*, 175 F.4th at 727 (quoting *Hernandez Alvarez*, 175 F.4th at 1273–74); *Castañon-Nava v. DHS*, 175 F.4th 828, 850–51 (7th Cir. 2026) (opinion of Lee, J.). And as we discuss below, a disjunctive reading of Section 1225(a)(3)—treating "applicant for admission" and "seeking admission" as distinct—better fits within Section 1225 and the INA as a whole.

In sum, Congress was clear about which terms it wanted to define and those it left to ordinary meaning. "Alien" is defined. 8 U.S.C. § 1101(a)(3). "Admission" is defined. *Id.* § 1101(a)(13)(A). "Applicant for admission" is defined. *Id.* § 1225(a)(1). "Seeking admission" is conspicuously *not* defined. The government cannot escape these choices. Just as Cirrus Rojas could not invoke ordinary meaning to argue he is not an "alien" or an "applicant for admission," the

government cannot ignore ordinary meaning and "deem" him to be "seeking admission" when that runs contrary to fact. The statute's plain text therefore shows Cirrus Rojas is not covered by Section 1225(b)(2)(A).

### 2.  Statutory Structure

We next consider the government's argument that Cirrus Rojas's reading creates structural problems within Section 1225. We reject that argument, then turn to the government's own structural problems within both Section 1225 and the INA overall.

### a.  Structural Fit of Cirrus Rojas's Reading

The government suggested at oral argument that distinguishing "seeking admission" from "applicant for admission" creates structural issues within Section 1225. Though not directly presented in the government's brief, we understand the argument like this. In Section 1225(a)(1), Congress deemed individuals "present in the United States who ha[ve] not been admitted" as applicants for admission. If those individuals are not "seeking admission" or "arriving in the United States," the government posits that it is not clear what work that category does in the section. They would not be subject to Section 1225(b)(2)(A)'s mandatory detention since they are not "seeking admission." Nor are they subject to expedited removal under Section 1225(b)(1)(A)(i) because they are not "arriving." And Section 1225(a)'s provisions for requiring "statements" and "withdrawal[s] of application[s]," which apply where aliens are "applying for admission" or have "intentions of … seeking admission," also seem inapplicable. *See id.* § 1225(a)(4), (5).

The government sees this as creating a surplusage problem within the section. As the government argues, Cirrus Rojas's reading would mean that Congress included those present in the interior without admission within "applicant[s] for admission" but then "excluded" them "from every operative consequence in the section where the phrase appears." *Hernandez Alvarez*, 175 F.4th at 1297 (Lagoa, J., dissenting). If Congress went out of its way to counterintuitively deem individuals like Cirrus Rojas "applicants for admission," then why (the government asks) does no provision of Section 1225 seem to apply to him?

But there are indeed sections of the INA that apply to "applicants for admission" like Cirrus Rojas. True, many instances of "applicant for admission" do apply only to those who are "arriving" and "seeking" admission at the border. But others—both within Section 1225 and the INA writ large—also apply to those who are simply "present" without admission in the interior, like Cirrus Rojas.

For example, Section 1225(a)(1) "deem[s]" aliens in the interior like Cirrus Rojas applicants for admission "for purposes of this chapter," *i.e.*, the whole INA. And Section 1229a, which governs removal proceedings, specifies that applicants for admission have "the burden of establishing" they are "clearly and beyond doubt entitled to be admitted" with no mention of whether those persons are "seeking admission." 8 U.S.C. § 1229a(c)(2)(A). Applicants for admission carry this burden whether they are arriving at the border or present without admission in the interior. Section 1225(a)(1)'s definition of "applicant for admission" is naturally placed at the top of the section about the initial admission process. But one of its key functions—to hold unadmitted aliens in the interior to the

same burden in removal as if they had never entered the country—kicks in several sections down.

Even within Section 1225 itself, the present-without-admission category of "applicant for admission" still does meaningful work under Cirrus Rojas's reading. Consider those in the interior "designated" for expedited removal under Section 1225(b)(1)(A)(iii). They are applicants for admission. *See id.* § 1225(b)(1)(A)(iii)(II) (applying to aliens "who ha[ve] not been admitted or paroled into the United States"); *id.* § 1225(b) (describing procedures for the "[i]nspection of applicants for admission"). But they are not "arriving." *See id.* § 1225(b)(1)(a)(i) (distinguishing "arriving" aliens from those "described in clause (iii)"). Nor does the statute require that they be "seeking admission." Rather, so long as they have not "been physically present in the United States continuously for the 2-year period immediately prior" to a determination of inadmissibility, the Attorney General may "designate" them for expedited removal. *Id.* § 1225(b)(1)(A)(iii). This section alone solves the government's purported surplusage puzzle. It applies to present-without-admission "applicants for admission" who are neither "arriving" nor "seeking admission."

Conversely, Cirrus Rojas's reading avoids the opposite surplusage problem of reading "seeking admission" out of the statute. Section 1225(b)(2)(A)—the provision that the government has invoked to detain Cirrus Rojas—is a "catch-all" that applies to "all applicants for admission not covered by § 1225(b)(1) (with specific exceptions not relevant here)." *Jennings*, 583 U.S. at 287. It applies only to those "applicants for admission" who are "*seeking* admission," a qualifier that does not appear in its neighbor (b)(1)(A)(iii). That variance

suggests Congress meant Section 1225(b)(2)(A) to apply to the subcategory of "applicants for admission" who are also "seeking admission." *See* Scalia & Garner, *supra*, at 170 ("[A] material variation in terms suggests a variation in meaning."). Cirrus Rojas's reading accounts for that meaningful variation; the government's reading does not.

These examples show that "applicant for admission" and "seeking admission" are distinct—both do independent work in Section 1225 and the INA overall. Some "applicants for admission" are also "seeking admission," and some are not. "It is our duty to give effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (cleaned up); *see* Scalia & Garner, *supra*, at 174. Cirrus Rojas's reading best honors this duty.

### b.  Structural Fit of Government's Reading

On the other hand, the government's interpretation creates a host of other structural problems within Section 1225 and the broader INA. First, equating "applicant for admission" and "seeking admission" disrupts several provisions in Section 1225. These provisions make little sense if applied to "applicants for admission" who, like Cirrus Rojas, are not literally "seeking admission" or "applying for" lawful entry at the border.

For example, Section 1225(b)(2)(A) imposes mandatory detention if "the examining immigration officer" finds that "an alien seeking admission" is not "clearly and beyond a doubt" admissible. Unlike Section 1225(a)(3)'s general "inspection" mandate (which Cirrus Rojas concedes applies to "applicants for admission" like him), Section 1225(b)(2)(A)'s reference to "the examining immigration officer" evokes a

specific interaction with a specific DHS official. This language suggests contact at the border, not the interior: DHS's own regulations outline a border-specific "examination" process applying to individuals presenting "in person to an immigration officer at a U.S. port-of-entry when the port is open for inspection." 8 C.F.R. § 235.1(a); *see Castañon-Nava*, 175 F.4th at 848 (opinion of Lee, J.).

How this language might apply to persons already in the country is unclear. It is, after all, unclear from this record who "the examining immigration officer" was in Cirrus Rojas's case, or how and when that officer "examined" him and found him inadmissible. And it is obvious that Cirrus Rojas is categorically inadmissible by statute so there is little work for the phantom "examining officer" to do under DHS's reading.

Next, Section 1225(a)(4) permits "[a]n alien *applying for* admission … to withdraw the application for admission and depart immediately from the United States" (emphasis added). The government says "applying" tracks "applicant" in Section 1225(a)(1). But consider that reading's practical implications. It is not clear how this "withdrawal" provision would work here: how can Cirrus Rojas "withdraw" an "application for admission" when "he never submitted anything in the first place"? *Barbosa da Cunha*, 175 F.4th at 80. Who decides if someone has "withdrawn" a fictional "application"? How would that decision be documented? Perhaps that is why DHS's "own regulations confirm that this voluntary withdrawal provision is available 'only [to] an *arriving* alien.'" *Id.* (quoting 8 C.F.R. § 1240.1(d)) (emphasis added). In other words, Section 1225(a)(4) only makes sense at the border, where an applicant for admission who is actively seeking—or "applying"—for admission has something to withdraw.

The government's reading also chafes against Section 1225(a)(5). The provision says:

> An *applicant for admission* may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in *seeking admission* to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible.

8 U.S.C. § 1225(a)(5) (emphasis added).

The government cites Section 1225(a)(5) to again argue that "applicant for admission" and a person "seeking admission" are the same. But the subsection itself suggests the opposite. If an applicant for admission is not in fact seeking lawful entry, Section 1225(a)(5)'s questions are pointless. They are, after all, "only relevant to those who have not yet entered the country." *Hernandez Alvarez*, 175 F.4th at 1273. "It would be absurd for an immigration officer to ask someone like [Cirrus Rojas]—who entered unlawfully and has been living here for [eight] years— to attest to his 'intended length of stay.'" *Barbosa da Cunha*, 175 F.4th at 81.

Instead, the subsection's reference to "purposes and intentions of the applicant … in seeking admission" suggest that "seeking admission" must be given its ordinary meaning—it cannot apply to those "deemed" applicants who do not *in fact* have any such purposes or intentions. *See* Scalia & Garner, *supra*, at 228 ("[W]here the artificial or limited meaning would cause a provision to contradict another provision, whereas

the normal meaning of the word would harmonize the two, the normal meaning should be applied.").

The government's reading is not only hard to square with the rest of Section 1225; it is also a poor fit for the INA writ large. Most broadly, the government misapprehends the INA's entire scheme by "shift[ing] the center of gravity for detention authority" from Section 1226 to the "ancillary catchall provision" of Section 1225(b)(2)(A). *Hernandez Alvarez*, 175 F.4th at 1276. Recall that Section 1226(a) has long been viewed as the "default rule" for the detention of "aliens … inside the United States." *Jennings*, 583 U.S. at 288. Its provisions squarely apply to Cirrus Rojas, who was first arrested on a Section 1226 warrant. The government now reimagines Section 1226 as limited to those who entered lawfully but lost lawful status, making them "deportable" under Section 1227 rather than "inadmissible" under Section 1182.

But the statute's plain language draws no such distinction: it applies equally to all "aliens"—both "inadmissible" and "deportable"—who may be "removed." 8 U.S.C. § 1226(a), (c); *see id.* § 1229a(1) (distinguishing between grounds of "inadmissibility" and "deportability" in removal proceedings). If Congress had wanted to limit Section 1226 to "deportable" aliens, it could have carved out "inadmissible" aliens from that section directly—not by negative implication through Section 1225, as the government suggests. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote.").

What is more, the government's reading also clashes with Section 1226's own mandatory-detention provisions, which deny bond to anyone who is inadmissible for having

No. 25-3127                                                    27

committed certain crimes or terrorist acts. 8 U.S.C. § 1226(c)(1)(A), (D), (c)(4). Just last year, in the Laken Riley Act, Congress expanded Section 1226(c) by adding additional offenses triggering its detention mandate. Pub. L. No. 119-1, 139 Stat. 3 (adding 8 U.S.C. § 1226(c)(1)(E)). There was "no need" for Congress to amend Section 1226(c) in this way if Section 1225(b)(2)(A) "had always covered" all inadmissible aliens present in the United States and required detention without bond. *Kleber*, 914 F.3d at 486.

Reading Section 1226(c) as redundant collides with the canon against surplusage, which "is strongest when an interpretation would render superfluous another part of the same statutory scheme." *City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) (citation omitted); Scalia & Garner, *supra*, at 176–77. To be sure, Congress sometimes legislates in belt-and-suspenders fashion. But the government's reading does not suggest belt-and-suspenders drafting: it invites "serious statutory redundancy" that undermines multiple statutory layers. *Hernandez Alvarez*, 175 F.4th at 1280.

The government argues Section 1226(c)'s mandatory-detention provisions are not surplusage under its reading by pointing to a very limited set of circumstances where they would still apply. In the government's view, they would still cover (1) aliens admitted erroneously who then commit enumerated crimes, and (2) aliens who enter unlawfully, commit such crimes, and would otherwise receive humanitarian parole. But the provisions—applying to "any alien" who is inadmissible after committing certain offenses—contain no such limitations. It is unlikely that "Congress wrote § 1226(c) so broadly" yet only intended it to apply so narrowly. *Barbosa da Cunha*, 175 F.4th at 87.

Thus, even if we accept that both of the competing readings of Section 1225 and Section 1226 create some friction within the INA, Cirrus Rojas's reading better fits the act's intricacies. The statutory structure confirms that Cirrus Rojas falls under Section 1226(a), not Section 1225(b)(2)(A).

### 3. Statutory History, Purpose, and Practice

We could stop here. But the history of the INA's detention provisions—how they have been amended and interpreted— supports our conclusion that Section 1225(b)(2)(A) does not apply to Cirrus Rojas.

Other circuits, most notably the Eleventh, have already laid out the complete statutory history of the INA's detention provisions; we need not recite it in full here. The Eleventh Circuit surveyed over a century of immigration law and concluded that Section 1225(b)(2)(A)'s predecessors have long applied detention without bond to aliens at the border, not those already in the country. *Hernandez Alvarez*, 175 F.4th at 1281 (citing Immigration Act of 1893, § 5, 27 Stat. 569, 570); *see also Castañon-Nava*, 175 F.4th at 851–52 (opinion of Lee, J.) (same). Section 1225(b)(2)(A)'s reference to those "seeking admission" tracks the same border focus. In contrast, Section 1226 "stems from newer interior-detention laws" aimed at preserving the Executive's discretion "to release noncitizens" arrested within the United States "pending final removal decisions." *Buenrostro-Mendez*, 166 F.4th at 513–14 (Douglas, J., dissenting) (citation omitted). Again, this backdrop confirms what the plain text and structure show: Section 1226(a), not Section 1225(b)(2)(A), fits Cirrus Rojas.

The upshot of the government's case is that IIRIRA ended this longstanding distinction. Before 1996, the immigration

laws "primarily distinguished individuals on the basis of 'entry' and not 'admission.'" *Hing Sum v. Holder*, 602 F.3d 1092, 1099 (9th Cir. 2010) (citation omitted). Those who had entered the United States—lawfully or not—enjoyed "greater procedural and substantive rights" in "deportation" proceedings, while those "who presented themselves at a port of entry for inspection were subjected to more summary exclusion proceedings." *Id.* at 1100.

The government cites legislative history to suggest that Congress sought to erase this disparity through IIRIRA by treating aliens unlawfully within the United States just like those arriving at the border. *See* Gov't's Br. at 41–42 (quoting H.R. Rep. No. 104-469, pt. 1, at 225 (1996) (discussing "equities and privileges in immigration proceedings" available to those who enter without inspection)). And, says the government, IIRIRA met that goal in part by extending Section 1225(b)(2)(A)'s mandatory-detention requirement from the border to the interior.

As an initial matter, legislative "purpose" cannot displace the INA's text. "Congress's purpose matters far less than what it wrote." *Buenrostro-Mendez*, 166 F.4th at 508. As explained above, what Congress wrote in Section 1225(b)(2)(A) and enacted in IIRIRA does not apply to Cirrus Rojas. That is the end of the line in interpreting statutes. Regardless, we do not find the government's appeal to legislative purpose persuasive on its merits.

Whatever IIRIRA's various "purposes" may have been, they were far more nuanced than what the government asserts. Its amendments to the INA show that Congress focused on eliminating disparities between lawful and unlawful entrants in removal procedures, not pre-removal detention. The

act heavily revised the INA to combine "deportation" and "exclusion" proceedings into one "removal" procedure, and replaced "entry" with "admission"—*i.e.*, *lawful* entry—as the touchstone for procedural rights in these proceedings. IIRIRA §§ 301(a), 304(a), 110 Stat. at 3009-575, -587 to -597.

IIRIRA did so by maintaining a distinction between "deportability" and "inadmissibility" in removal proceedings. Those who unlawfully entered without inspection remained "inadmissible" and shouldered a greater burden during the newly created removal proceedings. Those who lawfully entered the country with inspection and became "deportable" had greater protections during removal proceedings. This was accomplished in part by defining "applicant for admission" in Section 1225(a)(1) to include those "present in the United States" without admission. *Id.* § 302(a), 110 Stat. at 3009-579. Congress built that definition into Section 1229a(c)(2)(A) to require applicants for admission defending against removal—both at the border and in the interior—to show they are clearly and beyond doubt entitled to be admitted and not "inadmissible." *Id.* § 304(a), 110 Stat. at 3009-591.

On the other hand, Congress's changes to Section 1226(a)'s discretionary-bond regime maintained the statute's applicability to those present without admission like Cirrus Rojas. Before IIRIRA, Section 1226(a)'s predecessor applied to "deportab[le]" aliens, which—under the pre-IIRIRA framework—would have included those in Cirrus Rojas's shoes. 8 U.S.C. § 1252(a)(1) (1996). After IIRIRA, those like Cirrus Rojas were subject to removal based on grounds of "inadmissibility," not "deportability." But as amended, Section 1226(a) applies to aliens pending their "remov[al]," without

limitation. IIRIRA § 303(a), 110 Stat. at 3009-585 to -586 (emphasis added). Had Congress intended Section 1226(a) to exclude "inadmissible" aliens like Cirrus Rojas who entered without inspection, it could have simply kept the prior "deportability" language.

The same goes for Section 1225's inspection and detention provisions. Congress's biggest change to that section was the new expedited-removal procedure added in Section 1225(b)(1). *Id.* § 302(a), 110 Stat. at 3009-580. By contrast, Congress "retained the exact language used in [Section 1225(b)(2)(A)'s] predecessor statute," *Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*, 586 U.S. 123, 131 (2019), by keeping the verb "seeking" in that subsection. And given the other textual and contextual clues on the table, its mere "addition of ['applicant for admission']" to Section 1225(b)(2)(A) "is simply not enough of a change for us to conclude that Congress intended to alter the meaning of the reenacted term ['seeking']." *Id.*

Indeed, where Congress *did* expand the INA's mandatory-detention provisions, it did so carefully. When Congress expanded mandatory detention under Section 1226(c) to include "criminal aliens," it confronted the possibility that the Executive could not detain all aliens subject to mandatory detention at once. *See* H.R. Rep. No. 104-469, pt. 1, at 118, 120, 123 (estimating that there were 8,500 beds available in detention facilities in 1996, versus roughly 100,000 "criminal aliens incarcerated in Federal and State prisons" and 45,000 "criminal aliens ... placed in deportation proceedings each year"). This in mind, it let the Executive forgo enforcing Section 1226(c) as amended for up to two years based on a lack of "detention space and … personnel." IIRIRA § 303(b)(2), 110

Stat. at 3009-586 to -587. And the Executive twice used this authority to put off mandatory detention after IIRIRA passed. *See* 74 Interpreter Releases 1552–53 (Oct. 10, 1997).

That Congress did not enact a similar provision for Section 1225(b)(2)(A)—which would have mandated detention for at least two *million* people in 1996—is telling. H.R. Rep. No. 104-469, pt. 1, at 111. To be sure, "a Congressional omission" cannot override "clear text." *Buenrostro-Mendez*, 166 F.4th at 507–08; *Avila*, 170 F.4th at 1137–38. And the clear text shows Section 1225(b)(2)(A) does not apply to Cirrus Rojas. But to the extent we look to historical context to confirm our textual analysis, this omission is hard to ignore. Plus, similar context clues point to the same result. IIRIRA, though part of an appropriations bill, did not fund a mass-detention mandate, let alone one as vast as the government insists Congress intended. *See* H.R. Rep. No. 104-469, pt. 1, at 123; IIRIRA § 386, 110 Stat. at 3009-653 to -654 (contemplating an expansion of only five hundred beds). Congress in 1996 did not implement what the government claims IIRIRA enacted.

"It is easy to imagine why Congress might not have wanted to extend mandatory detention into the country's interior even as it equalized in other ways the treatment between noncitizens stopped at the border and those who entered unlawfully." *Santillan Quiroz*, 180 F.4th at 1248. If Congress had indeed demanded—but not funded—no-bond detention for all unlawful entrants, that may well have thrown the nation's immigration system into chaos and prevented the Executive from effectuating the act's goals. Immigration authorities might have found themselves quickly overwhelmed by a colossal unfunded mandate to arrest and detain millions like Cirrus Rojas who posed no flight risk or danger to the

community. All this is to say that "[d]eciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice," and "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–26 (1987). Given the conflicting trade-offs at stake in a statute like IIRIRA, we are not persuaded that Congress meant to end bond hearings for those like Cirrus Rojas.

Nor does post-enactment history suggest otherwise. Until last year, all three branches of our government agreed that Section 1225(b)(2)(A) applied only at the border. Five successive presidential administrations followed this interpretation. And the Executive's sudden about-face presents its own reason to doubt the government's new reading. We may "consider the consistency of an agency's views," and its "track record" over time, to assess "the persuasiveness of any interpretation it proffers in court." *Biden v. Nebraska*, 600 U.S. 477, 519 (2023) (Barrett, J., concurring) (citation omitted). We accept that when past practice clashes with a statutory mandate, it must change. After all, the courts interpret the law and often order the government to depart from the executive's prior understanding of the law. But here the government's about-face stems from anything but a clear statutory mandate. Instead, the government tries to mix legal fiction with real-world facts contrary to the statute's language. We hesitate to accept such a change after three decades of consistent contrary interpretation. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 156–57 (2000).

The Supreme Court has also associated Section 1225 with "aliens *seeking admission* into the country" and Section 1226 with aliens "*already in* the country." *Jennings*, 583 U.S. at 289

(emphasis added). To be clear, *Jennings*'s statements on this front—made in recounting the general statutory framework governing immigration detention—are nonbinding *dicta*; Section 1225(b)(2)(A)'s applicability was not before the Court in that case. But at minimum, the Supreme Court's unquestioning recitation of the border-interior distinction between Sections 1225 and 1226 is another data point suggesting that Cirrus Rojas's reading is correct.

And Congress has never repudiated the other two branches' interpretations since passing IIRIRA—either by clarifying Section 1225(b)(2)(A)'s text or funding its supposed mass-detention mandate. Indeed, DHS has historically "never had 'sufficient detention capacity to maintain in custody every single person described in Section 1225'" even under the Executive's old reading of the statute due to "consistent and significant funding shortfalls." *Texas*, 597 U.S. at 792 (citation omitted). Congressional failure to intervene and correct the Executive's prior interpretation—despite passing the Laken Riley Act last year—"is persuasive evidence that the interpretation is the one intended." *FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 437 (1986).

The government's textual interpretation further unravels when read in this context. We read statutes with a "common sense" understanding of their impacts. *West Virginia v. EPA*, 597 U.S. 697, 722 (2022) (citation omitted). Put simply, Congress does not hide "elephants in mouseholes." *Whitman v. American Trucking Associations, Inc.*, 531 U.S. 457, 468 (2001). The government asks us to accept that Congress in 1996 tucked "the broadest mass-detention-without-bond mandate in our Nation's history" into an obscure corner of its new law and has never bothered to fund it for three decades since.

*Barbosa da Cunha*, 175 F.4th at 69–70. That is more than an "elephant in a mousehole": it "cram[s] a veritable legislative zoo into one clause of one subparagraph of one subsection of our Nation's vast immigration laws." *Patel v. Garland*, 596 U.S. 328, 365 (2022) (Gorsuch, J., dissenting). We cannot believe Congress intended such a result.

Historical context thus confirms what the INA's text shows: Congress in 1996 left the essential border-interior distinction in the INA's detention provisions alone. Perhaps applying Section 1225(b)(2)(A) to the interior superficially matches other changes Congress made to the INA through IIRIRA. But the statutory history reveals that Congress did not pursue this project at all costs. It worked the INA with a scalpel, not a sword. And it preserved Section 1226's application to aliens already in the country.

### 4. *Constitutional Concerns*

Finally, a word about this case's constitutional dimensions. As discussed, the plain meaning of the INA shows that Cirrus Rojas falls under Section 1226 and is thus not subject to mandatory detention. But even if we thought the law ambiguous, we would still confront a strong argument for reversal. The government's interpretation poses grave due-process concerns. Cirrus Rojas's case illustrates this point. And when faced with an ambiguous statute subject to multiple readings, we "may shun an interpretation that raises serious constitutional doubts." *Jennings*, 583 U.S. at 286.

The Fifth Amendment's Due Process Clause protects all persons in the United States—even those unlawfully

present—from unjustified deprivations of liberty.[7] *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). Detention without sufficient purpose, or indefinitely prolonged detention, threatens due process. *Id.*

The government has never justified detaining Cirrus Rojas pending his removal proceeding beyond its view that § 1225(b)(2)(A) requires it. In general, the government detains aliens pending removal for two reasons: to (1) ensure that they appear at future immigration proceedings, and (2) protect the community if the person is dangerous. *Lopez-Campos*, 175 F.4th at 732; *see also Zadvydas*, 533 U.S. at 690. The government need not always make an individualized showing that the person might flee or endanger the community. It may detain "criminal aliens" without bond under Section 1226(c) "by reference to the legislative scheme" categorizing them as a danger to society. *Demore v. Kim*, 538 U.S. 510, 523–24 (2003) (citation omitted). But it still must have a reason to detain an alien pending removal.

Cirrus Rojas's case highlights the constitutional infirmities of the government's approach. Not one but two separate immigration judges have now said he is neither a flight risk nor a danger to the community. The government has not

---

[7] The government invokes the "entry-fiction" doctrine to argue Cirrus Rojas remains "at the border" for constitutional purposes because he illegally entered the United States. Thus, it concludes, his due-process rights are only what Congress has authorized. *Thuraissigiam*, 591 U.S. at 138. We need not dwell on this argument. The petitioner in *Thuraissigiam* was arrested only twenty-five yards from the border. *Id.* at 140. And the Supreme Court expressly limited its holding to those persons "in [his] position." *Id.* Cirrus Rojas is not in that position; he has lived in the United States for years and was arrested nowhere near the border.

challenged those findings in its most recent BIA appeal. Nor has it sought to detain Cirrus Rojas by reference to a statutory scheme classifying him as posing a specific danger.[8] Yet under the government's interpretation of Section 1225(b)(2)(A) it must detain him anyway, with no further adjudication of risk.

The government's interpretation of Section 1225(b)(2)(A) could thus permit it to detain aliens with no apparent purpose. And at minimum, there is a very real risk that the government's reading will sweep in others like Cirrus Rojas who have already been found not to be dangers or flight risks. The Due Process Clause forbids such arbitrary detention. This alone makes us doubt the government's interpretation as a matter of constitutional avoidance. *Zadvydas*, 533 U.S. at 690.

That aside, "[i]t is not hyperbolic to project" that the government's interpretation might subject those like Cirrus Rojas to unconstitutionally prolonged detention pending their removal proceedings. *Barbosa da Cunha*, 175 F.4th at 95. While "criminal aliens" detained under Section 1226(c) are removed on a fast track, *Demore*, 538 U.S. at 529, aliens detained under Section 1225 are not. In practice, ordinary removal proceedings can take years. *Barbosa da Cunha*, 175 F.4th at 94; *Lopez-Campos*, 175 F.4th at 733 n.3. These factors raise the specter of

---

[8] The government has never argued that we may categorize everyone present without admission as flight risks or dangers to the community "by reference to the legislative scheme." *Demore*, 538 U.S. at 524. Such an argument would be difficult to reconcile with *Demore*, which upheld mandatory detention under Section 1226(c) by reference to a narrower, "justifiabl[e] concern[] that deportable *criminal* aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Id*. at 513 (emphasis added).

"indefinite" detention that the Court in *Zadvydas* found unacceptable. 533 U.S. at 690.

But again, these concerns do not drive our holding. Instead, we conclude based on the INA's text, structure, and history that Section 1225(b)(2)(A) unambiguously does not apply to Cirrus Rojas.

### III. Conclusion

We end where we started. The government has moved from relying upon Section 1226(a)'s discretionary-bond provision to a new interpretation that Section 1225(b)(2)(A)'s mandatory-detention clause controls. This presents a stark choice between two competing readings of the INA, with the circuits split over the correct interpretation. We share the dissent's hope that the Supreme Court will settle this matter and bring uniformity.

We hold Cirrus Rojas is present in the United States without admission and is not "seeking admission." He is therefore not subject to mandatory detention under 8 U.S.C. § 1225(b)(2)(A) and is eligible for a bond hearing under 8 U.S.C. § 1226(a). Accordingly, we REVERSE the district court's denial of Cirrus Rojas's habeas petition and REMAND with instructions to issue the writ "and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

SYKES, *Circuit Judge*, dissenting. For the last year, federal courts across the country have disagreed about the proper interpretation of the immigrant-detention statute at issue here. The contending positions have been exhaustively explored, and there is now a well-developed circuit split. I therefore share my colleagues' inclination to avoid spilling more ink than is necessary to resolve this appeal. "'It has all been said before, but not by us'" is hardly an excuse for "burdening the reader" with exegesis. *United States v. Prince*, 171 F.4th 1009, 1011 (7th Cir. 2026). So rather than engage with each of the grammatical, structural, and historical points in my colleagues' thoughtful opinion, I instead direct the reader to Judge Murphy's comprehensive and well-reasoned dissent in *Lopez-Campos v. Raycraft*, 175 F.4th 713, 735 (6th Cir. 2026) (Murphy, J., dissenting), with which I fully agree, and offer only a brief explanation of the key reasons why I find the government's interpretation of the statute more persuasive than Cirrus Rojas's.

In my view, it's most helpful to start with the statutory section actually at issue here—namely, 8 U.S.C. § 1225. As the majority notes, this statute begins by deeming all aliens present in the United States without admission as "applicants for admission" for purposes of the Immigration and Nationality Act ("INA"):

> **(a) Inspection**
>
> **(1) Aliens treated as applicants for admission**
>
>> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival … ) shall be deemed for

> purposes of this chapter an applicant for admission.

§ 1225(a)(1). This designation applies to Jaciel Cirrus Rojas. He is a native and citizen of Mexico who unlawfully entered the United States without admission in 2018; he was arrested in Wisconsin in June 2025.

Section 1225 then establishes a comprehensive inspection regime that applies to all applicants for admission: "All aliens … who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." § 1225(a)(3). At that point the applicant faces a choice: He may seek permission "to withdraw [his] application for admission and depart immediately from the United States." § 1225(a)(4). Or he may proceed with the inspection process, "stat[ing] under oath any information sought by an immigration officer regarding [his] purposes and intentions … in seeking admission to the United States." § 1225(a)(5).

The applicant's choice to proceed through inspection (rather than leave the country) triggers the statutory detention and removal process set forth in § 1225(b). That process follows one of two tracks. The first is an expedited removal procedure, which applies to arriving aliens who lack valid entry documents or who attempt to procure their admission by fraud. § 1225(b)(1)(A)(i); *see* 8 U.S.C. § 1182(a)(6)(C), (a)(7). The expedited process also applies, at the discretion of the Executive Branch, to unadmitted aliens present in the country who have lived here less than two years. § 1225(b)(1)(A)(iii). Cirrus Rojas has lived in the United States for at least eight years, so this provision doesn't apply to him. No more needs to be said about it.

Section 1225(b)(2), titled "Inspection of other aliens," functions as a catchall for everyone else:

> [I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

§ 1225(b)(2)(A). Cirrus Rojas doesn't claim he is entitled to admission. So if this provision applies to him, as the government contends, then he must be detained during removal proceedings; if it does not, then the alternative detention scheme in 8 U.S.C. § 1226(a) applies and authorizes his release on bond.

My colleagues have much to say about the real-life, on-the-ground facts that in their view make § 1225 seem like a strange fit as applied to Cirrus Rojas. In some senses, it is. It would indeed be odd to ask Cirrus Rojas, who has been living in the United States for eight years and who was arrested without warning, whether he "intends to remain permanently" in the country. § 1225(a)(5). And he is not *in fact* "seeking admission" into the United States. § 1225(b)(2). Understandably so. As the majority notes, even if Cirrus Rojas formally applied for admission, his application would go nowhere because he is inadmissible. § 1182(a)(6)(A)(i) ("An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible.").

But it's the majority's zeroed-in focus on the facts particular to Cirrus Rojas that leads it astray. Section 1225's applica-

tion is fixed primarily by *law*, not (as the majority sees things) by *facts*. Because Cirrus Rojas is "present in the United States" and "has not been admitted," § 1225(a)(1) deems him an "applicant for admission" for purposes of the INA—and that's so *regardless* of whether he is *actually* pursuing admission into the United States. So while the facts suggest that Cirrus Rojas is not "seeking" or "applying for" admission, the law nonetheless treats him as though he is.

This "legal fiction," as the majority puts it, is the product of a statutory classification embedded into the modern immigration code. Historically, the INA differentiated between aliens at the border and those who had already entered the country (whether lawfully or not). Aliens at the border were entitled to few procedural protections; most notably, these noncitizens were subject to mandatory detention during their exclusion proceedings unless they were "clearly and beyond a doubt entitled to land." 8 U.S.C. § 1225(b) (1994). Aliens taken into custody in the country's interior, by contrast, could apply for "release[] under bond" while they awaited deportation. *Id.* § 1252(a)(1).

This distinction, as the Ninth Circuit pointed out, "resulted in an anomaly." *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010). Aliens who evaded inspection and sneaked across the border could seek release on bond; those who sought to enter the country lawfully could not.

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") remedied this anomaly by instituting a new statutory touchstone: admission. No longer did an alien's substantive and procedural entitlements hinge on the mere fact that he had crossed the border. Instead, his entitlements hinged on his "admission" by immigration author-

ities—that is, his "*lawful* entry" into the United States "after inspection and authorization." 8 U.S.C. § 1101(a)(13) (emphasis added).

Under IIRIRA, an alien who enters the country illegally (and thus has not been "admitted") is presumptively subject to removal; he bears the "burden of establishing" that he is "clearly and beyond doubt entitled to be admitted" into the United States. *Id.* § 1229a(c)(2). An admitted alien, by contrast, is entitled to greater procedural protections: The burden lies with the government to establish "by clear and convincing evidence" that for one of the reasons listed in § 1227, he is "deportable." § 1229a(c)(3)(A). (These reasons include, for example, failing to maintain nonimmigrant status or being convicted of a serious crime. *Id.* § 1227(a)(1)(C), (a)(2).)

By reorienting removal procedures around an alien's admission by immigration authorities rather than his physical entry into the country, Congress eliminated the procedural windfall that had long accrued to aliens who evaded inspection at the border. And in so doing, it put all aliens who have not lawfully entered the country on equal footing: Today, any alien who "arrives" or is "present" in the United States without admission is deemed an "applicant for admission" and is treated as though he never entered the country at all. § 1225(a)(1). That unquestionably includes Cirrus Rojas. By operation of law, he is an "applicant for admission" and must be treated as if he is applying for or seeking admission into the United States *regardless* of whether he is in fact doing so. The law classifies him as *constructively* seeking or applying for admission.

My colleagues acknowledge, as they must, that Cirrus Rojas is an "applicant for admission" under § 1225(a)(1).

Majority Op. at 11–12. They also appear to acknowledge that he is at least nominally subject to inspection by immigration officers under § 1225(a)(3). *Id.* at 23. But from there they conclude that § 1225 has no further application to him. He need not answer the inspecting officers' questions (as the statute requires) because he is not *actually* "seeking admission to the United States." § 1225(a)(5). And he is not subject to mandatory detention under § 1225(b)(2)(A)—again, because he is not *actually* "seeking admission" to the United States.

But that interpretation ignores the legal effect of the constructive application for admission that arises by operation of law under § 1225(a)(1). And it relegates § 1225(b)(2)(A)'s detention mandate from "a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)," *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018), to a far more limited provision that applies to only a subset of arriving aliens—undoing IIRIRA's key shift to lawful *admission* (rather than *entry*) as the criterion for determining which removal procedures apply. And that, in turn, saps an important part of IIRIRA of its full effect. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *see also Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, 175 F.4th 1258, 1298–99 (11th Cir. 2026) (Lagoa, J., dissenting).

That is not the only reason to question the majority's reading. As Judge Murphy explains, the INA repeatedly uses the phrases "seeking" or "applying for" admission "in ways that include those who are present in this country after an illegal entry." *Lopez-Campos*, 175 F.4th at 746 (Murphy, J. dissenting). One prominent example is § 1182(d)(5), the provision governing humanitarian parole; if the terms "seeking" and "apply-

ing for" admission mean *actually* seeking or applying for admission, then Cirrus Rojas and aliens like him would not be eligible for parole. *Id.* at 751–52. I doubt that unadmitted immigrants would prefer this interpretation of the parole provision. And elsewhere in the immigration code the phrase "seeking admission" simply *can't* mean what the majority says it does. An example: Section 1182(a)(9)(B)(i) deems as "inadmissible" any alien who was "unlawfully present in the United States" and who, after departure or removal, "*again* seeks admission" into the country. (Emphasis added.) If "seeking admission" means *in fact* "seeking admission," then the presence of "again" makes no sense. If, by contrast, that phrase means "being treated as an applicant for admission by virtue of an unlawful entry," then the use of "again" is perfectly coherent. *Id.* at 752–53.

My aim here is not to try to counter each of the majority's points. Rather, it's to show that statutory incongruities are not unique to the government's interpretation; Cirrus Rojas's reading produces them too. Indeed, when an old and complex statute like the INA has been repeatedly amended and is riddled with legal fictions, terms of art, and redundancies, incongruities are sure to exist. As Judge Learned Hand said a century ago, our immigration laws are "so confused, contradictory, minute[,] and manifold" that they "inevitably produce such caprices." *United States ex rel. Georgas v. Day*, 43 F.2d 917, 919 (2d Cir. 1930).

It's for this reason that I find dictionary definitions and canons of construction largely unhelpful here. My colleagues and I could debate until we're blue in the face about whether "an applicant for admission" is necessarily "seeking admission" (the answer is yes, unless the applicant chooses to

depart the country) or whether (and to what extent) the rule against superfluity or any other interpretive canon helps answer that question. Thoughtful judges across the country have been engaging in precisely these debates. My takeaway from their conflicting opinions is this: For every grammatical thrust, there is a parry; for every canon of construction, there is an exception that calls for the canon to give way. *See Mullin v. Al Otro Lado*, 146 S. Ct. 2079, 2092 (2026) ("The anti-surplusage canon is not an iron rule.").

Accordingly, dictionary definitions, analogies to real-world uses of the word "admission," and the various meanings of the word "otherwise" do not—cannot—resolve this case. *See* Majority Op. at 12–13, 17–19. Rather, the interpretive question presented here is best answered by reference to the statutory classification that pervades the INA. Section 1225(a)(1) deems both arriving and unlawfully present aliens as "applicants for admission." And by design, *all* applicants for admission are subject to the same inspection and removal procedures. *See* §§ 1225(a), 1229a(c)(2). In my view, they are also subject to the same mandatory-detention requirement. Nothing in the statute—and certainly not the use of the verb "seeking" in lieu of the noun "applicant"—suggests that Congress intended otherwise. Indeed, had Congress wanted to differentiate between arriving and present aliens, it easily could have done so; many provisions in the INA apply only to aliens "arriving" in the United States. *E.g.*, § 1225(a)(2), (b)(1)(A)(i), (c)(1); 8 U.S.C. § 1231(b)(1).

I thus am persuaded by the majority opinions of the Fifth and Eighth Circuits, as well as the dissenting opinions authored by Judges Kirsch, Lagoa, and Murphy. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *Avila v. Bondi*,

No. 25-3127                                                    47

170 F.4th 1128 (8th Cir. 2026); *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 175 F.4th 828, 863 (7th Cir. 2026) (Kirsch, J., dissenting); *Hernandez Alvarez*, 175 F.4th at 1285 (Lagoa, J., dissenting); *Lopez-Campos*, 175 F.4th at 735 (Murphy, J., dissenting). These opinions cover the waterfront, comprehensively rebutting each of the grammatical, structural, and historical points on the other side. I see no reason to say more.

At this point, only the Supreme Court can bring uniformity and settle this question once and for all. I anticipate that it will do so soon. The Solicitor General has filed two petitions for certiorari asking the Supreme Court to review the decisions of the Second and Sixth Circuits addressing this very question. Petition for Writ of Certiorari, *Rhoney v. Barbosa da Cunha* (No. 26-104); Petition for Writ of Certiorari, *Raycraft v. Lopez-Campos* (No. 25-1415).[1] I hope the Court accepts the Solicitor General's invitation. The arguments on both sides have been fully ventilated, the circuits are deeply split, and our court has joined the wrong side. Cirrus Rojas is an "applicant for admission" who is subject to § 1225(b)(2)'s mandatory-detention regime. Because the majority concludes otherwise, I respectfully dissent.

---

[1] The immigrants who lost in the Fifth Circuit have likewise petitioned for a writ of certiorari. Petition for Writ of Certiorari, *Buenrostro-Mendez v. Blanche* (No. 26-43).